UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROJEANIQUE T. GREEN, | 19-CV-00126 |
| Plaintiff, | |
| | |
| VERSUS | JUDGE MARTIN L.C. FELDMAN |
| SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | MAGISTRATE JUDGE |
| | JANIS VAN MEERVELD |

REPORT AND RECOMMENDATION

The plaintiff, Rojeanique T. Green, age 21, seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for supplemental security income under Title XVI of the Act, 42 U.S.C. §1381. The matter has been fully briefed on cross-motions for summary judgment. For the following reasons, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 13) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 18) be GRANTED.

**Procedural Background**

Ms. Green applied for SSI on March 10, 2016, asserting a disability onset date of February 3, 2016. She alleged the following illnesses, injuries, or conditions: ADHD and social phobia. On April 29, 2016, her claim was denied by the state agency. Ms. Green obtained counsel and requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 21,

2017. On November 24, 2017, the ALJ issued an adverse decision. Ms. Green timely appealed to the Appeals Council, which denied review on November 7, 2018.

On January 8, 2019, Ms. Green filed a Complaint in federal court to review the Commissioner's decision. (Rec. Doc. 1). The Commissioner answered and filed the administrative record. (Rec. Docs. 10, 11). The parties filed cross-motions for summary judgment. (Rec. Docs. 13, 18). Ms. Green is represented by counsel.

## **Evidence in the Record**

*Social Security Records*

On March 31, 2016, Ms. Green completed a Social Security Administration Function Report. R. at 219-224. She noted difficulties with social phobia, dyslexia, ADHD, depression, schizophrenia, bipolar, and schizoaffective disorder. R. at 219. She reported attending classes at River Parish Community College on Monday, Wednesday, and Friday from 8:00-8:50, 9:00-9:50, and 1:00-1:50 as well as on Tuesday and Thursday from 1:30-2:45. R. at 220. She reported having severe impairments with dressing, bathing, and caring for her hair. Id.  She reported that her grandmother gives or reminds her to take her medication. R. at 221. She reported that she only goes outside to get in the car and go to classes. R. at 222. She reported that she does not feel comfortable around strangers. Id.  She reported that she shops for food once a month with her grandmother's help. Id.  She listed watching tv as a hobby and reported doing so mostly every day. R. at 223. She reported that she does not spend time with others and she listed going to school as the only place she goes on a regular basis. Id.  She reported that her conditions affect her ability to concentrate, complete tasks, understand, and follow instructions. R. at 224. She reported that she can pay attention "for a little while." Id.  She reported she does not handle stress very well and that changes in routine are hard to handle at first. R. at 225.

*Hearing Testimony*

A hearing was held before the ALJ on August 21, 2017. R. at 26. Ms. Green was represented by her attorney, Clarence Thornton, who argued that Ms. Green is disabled under Social Security Listing 12.05B. R. at 29. Alternatively, counsel argued that Ms. Green should be found disabled at Step 5 of the five-step disability evaluation process because she is unable to sustain work eight hours a day, five days a week. R. at 34.

Ms. Green testified that she graduated from high school, although she had received 504 special education accommodations. R. at. 46. She testified that she had been attending River Parish Community College since January 2016. R. at 37. She said that RPCC does not do report cards, but she reported that she had passed all her classes.  Id.  She said that she went to class every day and that her classes had about 35-40 students. R. at 38. She sits in the front of the class. Id.

When Ms. Green is not in class, she says she does "nothing." R. at 39. She said she just stayed in her room over the weekend. Id.  Ms. Green testified that she passed her driver's test the second time she took it. R.at 38-39. However, she said that she does not drive a car. R. at 45. Ms. Green testified that when she leaves the house, she is generally with someone. Id.  When asked by her attorney if she is able to leave the house by herself without someone else's assistance, she responded "No." Id.

Ms. Green also testified about her previous work. She said she worked at Pizza Hut, Schlotzky's Deli, and Dollar General, but that she did not like interacting with customers and would try to find something to do that does not involve interacting with them. R.at 40-41. She explained she also does not like handling money. R. at 41.  However, she reported that she did not have problems with her manager or coworkers. R. at 42.

As to her life at home, Ms. Green testified that she cleans her room every other day, but she cannot do so at a fast pace. R. at 47. She testified that she gets distracted when doing chores or might forget to do them. R. at 48. She said that she has good and bad days. Id.  On bad days, she stated that she cannot think or stay focused or she gets mad or depressed. Id.  She testified that she has bad days "quite often." Id.  She testified that she missed five or six days of school the previous semester. Id.

Ms. Green testified that she sees a counselor every six weeks and a doctor almost every three months. R. at 46.  She testified that she has trouble falling asleep even if she takes her medicine. R. at 49. She said she feels like she has "not too much" energy. R. at 50.

A vocational expert testified at the hearing. R. at 51. The ALJ asked her to consider an individual with Ms. Green's age, education, and vocational background with no exertional limitations but with the following mental limitations: for understanding, remembering, and carrying out instructions, the individual can perform simple and routine tasks and some complex tasks; use of judgment is related to work-related decisions; interaction with the general public is only frequent; dealing with changes in work setting is limited to work-related decisions; and no shift work or route sales work. R. at 53. The vocational expert testified that such a person could perform work as a maid, DOT No. 323.687-014, medium duty, SVP of 2, with 444,900 jobs available in the national economy; a commercial cleaner, DOT No. 381.687-018, medium duty, SVP of 2 with 982,200 jobs available in the national economy; and a silver wrapper, DOT No. 318.687-018, light duty, SVP of 1; with 151,800 jobs available in the national economy.

The ALJ asked the vocational expert to consider the same hypothetical person but to change interaction with the public to only occasional and to make interaction with

supervisors/coworkers frequent. R. at 54. The vocational expert testified that the same jobs would be available. Id.

The ALJ asked the vocational expert to again consider the same hypothetical person but to change interaction with supervisors and coworkers to occasional. Id. The vocational expert testified that the same jobs would be available. Id.

Ms. Green's attorney asked the vocational expert to consider if the same hypothetical person was off-task 33% of the day due to the mental functional limitations. R. at 54-55. The vocational expert testified that such a person would not be able to maintain work with that off-task rate. R. at 55.

*Medical Records*

On March 21, 2014, Ms. Green met with Dr. Ross Gallo at Gonzales Mental Health Center ("GMHC"). R. at 380. Her prescription for Lexapro (for depression) and Desyrel (for insomnia) were increased. R. at. 380.

Ms. Green returned to GMHC on April 30, 2014 and met with psychiatrist Dr. Jay C. Pennington. R. at 381. Ms. Green was glum, downcast, distracted, uncommunicative, casually groomed, and looked unhappy. Id. There were no apparent signs of hallucinations, associations were intact, thinking was logical, and thought content was appropriate. Id. Homicidal ideation was denied. Id. Her social judgment and insight into problems was fair. Id. There were no signs of anxiety, but she was easily distracted. Id. She was diagnosed with ADHD and unspecified depressive disorder. Id. Her prescription for Abilify was continued and her prescriptions for Desyrel and Lexapro were continued at the previous, increased level. Id.

Ms. Green returned to GMHC on August 20, 2014. R. at 383. Ms. Green's condition was stable and no psychiatric complaints or side effects were expressed. Id. Ms. Green's affect was

flat, she was inattentive and minimally communicative, but she was relaxed. Id. There were no signs of hallucinations, her associations were intact, and suicidal and homicidal ideation was denied. Id. However, her insight into problems and social judgment appeared poor. Id. There were no signs of anxiety, but she was easily distracted. Id. Her prescriptions for Abilify, Desyrel, and Lexapro were continued. Id.

On February 11, 2015, Ms. Green returned to GMHC to meet with Dr. Pennington. R. at 272. She was well groomed and made good eye contact. Id. She reported she was very tired and that although she takes her medication at 9:00 p.m. she does not fall asleep until 11:00 p.m. Id. A four-pound weight gain since her last visit was noted, and Registered Nurse Susan Veillon discussed the need for exercise. Id. Ms. Green reported no complaints about school. R. at. 274. Dr. Pennington noted that Ms. Green was calm, friendly, attentive, minimally communicative, casually groomed, and appeared happy. Id. Her speech was normal and her language skills were intact. Id. Her mood was normal and her affect was appropriate. Id. Associations were intact, thinking was logical, and thought content appeared to be appropriate. Id. Insight and judgment were fair. Id. There were no signs of anxiety or hyperactive or attentional difficulties. Id. Her behavior was cooperative and attentive with no gross behavior abnormalities. Id. She was diagnosed with ADHD and other unspecified depressive disorder. Id. Her prescriptions for Abilify, Desyrel, and Lexapro were refilled. Id.

On July 2, 2015, James A. Van Hook, III, PhD conducted a mental status examination of Ms. Green upon referral by the state agency. R. at 333. Dr. Van Hook was provided with a teacher questionnaire, ACT score report, a psychological evaluation by Dr. Gross dated June 12, 2013, and six progress notes from 2014 and early 2015. Id. Dr. Van Hook administered the Wechsler Adult Intelligence Scale-IV and Ms. Green attained a Full-Scale IQ of 72, which is in the

borderline range of intellectual functioning. R. at 334. Dr. Van Hook noted that Ms. Green's effort was adequate but that the test results were likely "spuriously low in light of her lethargy and depressed mood." R. at 334-35. Dr. Van Hook diagnosed a history of ADHD, generalized anxiety disorder, unspecified depressive disorder, and academic problems. R. at 335.  Dr. Van Hook noted that Ms. Green's ability to understand, remember, and carry out instructions was intact during the examination. Id.  Her ability to maintain attention/concentration for performance of simple repetitive tasks was reasonable. Id.  However, she showed some memory trouble. Id.  She showed an adequate level of social judgment and understanding of the general principles related to social situations. Id.  Dr. Van Hook found Ms. Green's ability to sustain effort and persist at a normal pace over the course of a routine 40-hour workweek was mildly impaired from a psychological perspective by her anxiety and depression. Id.  Her ability to show adequate stress tolerance was mildly impaired. Id.  Dr. Van Hook noted that Ms. Green showed constricted affect during the examination. Id.  The prognosis was guarded. Id.

Ms. Green presented at the Reddy Family Medical Clinic on August 21, 2015, complaining of headaches over the past week. R. at 337. She reported sitting at the back of the classroom and squinting at the white board. Id.  She was prescribed Fioricet, referred to an ophthalmologist for an eye exam, and advised to ask her teacher to be moved closer to the board. R. at. 338.

On September 22, 2015, Ms. Green participated in a treatment planning session at GMHC with licensed clinical social worker David Rougeau. R. at 278. Ms. Green was in a good mood with a bright affect. Id.  Compliance with medication was noted to be good. Id.  Self-care skills were intact, domestic skills were intact, relationships with family and friends were normal, and school performance was normal. Id.  No outbursts, expressions of anger, or impulsive behaviors were reported. Id.  The therapy session consisted of speaking about problems in school (she

reported that she would be finishing high school in December). Id.  The therapeutic focus was, in part, on helping clarify areas of difficulty and to develop coping skills and to manage stress. Id. The focus was also on helping Ms. Green improve her problem-solving skills. Id.  A mental status examination was performed. Id.  Ms. Green's mental status had no gross abnormalities. Id.  She was friendly and communicative, and her mood was euthymic with no signs of depression or manic process. Id.   Her speech was normal. Id.   Suicidal and homicidal ideation were denied; hallucinations and delusions were denied. R. at 279.  Her cognitive functioning was noted to be intact and age appropriate. Id.  There were no signs of anxiety. Id.  Ms. Green was diagnosed with ADHD, combined presentation and other unspecified depressive disorder. R. at 281. She was assessed with a GAF of 50. Id.  Ms. Green's attentional problems were identified as active and in need of treatment. R. at 282. Her long-term goal was not to disrupt the school or work environment. Id.

Ms. Green returned to GMHC for individual counseling with licensed clinical social worker Elizabeth Standiver on October 7, 2015. R. at 295. Ms. Green reported overall moderate progress and stability. R. at 295. Ms. Green reported that she was having difficulty in school this year and that she had not had problems the previous year. Id.  She reported struggling with vision and reading comprehension. Id.  She reported feeling irritable regarding the noise and activity level in class and that she had trouble managing her frustration. Id.  She said she had walked out of class twice. Id.  She reported that she had some friends at school. Id.  Ms. Standiver observed Ms. Green had good eye contact and normal range, conservative speech, flat affect, and cooperative mood. Id.  Ms. Standiver noted that Ms. Green admitted to mild homicidal tendencies of wanting to "slap [other students] up side the head." Id.

Ms. Green met with Dr. Pennington on January 27, 2016 at GMHC. R. at 298. She reported graduating from high school in December and that she had begun attending River Parishes Community College. Id.  She had no complaints other than being unable to fall asleep until the early morning hours and then being sleepy during the day. Id.  Dr. Pennington noted that Ms. Green appeared to be stable and had no psychiatric complaints. Id.  Dr. Pennington observed Ms. Green's dress and grooming were appropriate, she was communicative and friendly, and her mood was euthymic with no signs of depression or manic process. Id.  Her associations were intact, her thinking was generally logical, and her thought content was appropriate. Id. There were no signs of anxiety or attentional or hyperactive difficulties. Id.  Ms. Green was continued on Abilify and Lexapro and her dosage of Desyrel was increased for insomnia. Id.  Notes in her GMHC file dated February 4, February 5, February 10, February 15, and February 16, 2016 indicate that Ms. Green's health care provider was refusing to approve coverage of Abilify because of a break in medication management and that the provider's protocol required Ms. Green to try Lexapro for at least 30 days before Abilify could be considered as an adjunct medication for major depression. R. at 304-08.

A psychological evaluation was performed by Darlyne G. Nemeth, Ph.D.,  on February 3, 10, and 15, 2016, upon referral from her counselor. R. at 342. During the initial interview, Ms. Green's mood was depressed, she reported visual hallucinations, she reported school related problems, she reported frequent forgetfulness, and she reported that she was not on attentional medication at the time. R. at 343.  Dr. Nemeth administered the Reynolds Intellectual Assessment Scales, Second Edition and Ms. Green obtained low average verbal intelligence index and average nonverbal intelligence, composite memory, and speeded processing indices. R. at. 348. The Wide Range Achievement Test-Revision 4 was administered to estimate Ms. Green's educational level.

9

Id. She scored at a fourth-grade reading level, a ninth-grade sentence comprehension level, an eleventh-grade spelling level, and an eighth-grade math computation level. Id. The Brown ADD Scales – Self-Report was completed by Ms. Green to assess the presence of ADHD. R. at 349. Ms. Green reported difficulties in attention, effort, and memory. Id. Her scores indicated ADHD was highly probable. Id. The Test of Variables of Attention was administered to Ms. Green. Id. Her total standard scores were within normal limits. Id. Dr. Nemeth noted that Ms. Green exhibited difficulties with inattention after the first five minutes of "on task" behavior and she exhibited impulsive errors after 15 minutes of on-task behavior. Id. Ms. Green completed a Behavior Rating Inventory of Executive Function – Adult Form, Self Report. R. at 350. She reported emotional control, task initiation, and organization of materials to be within expectancy, but other areas, especially learning and behavior, were problematic. Id. Ms. Green also completed a Behavior Assessment System of Children Third Edition, Self-Rating Scales-Adolescent. R. at 350. Ms. Green's adaptive skills were especially problematic. Id. Anxiety, depression, and atypical thinking were also significant problem areas. Id. Ms. Green completed a Symptom Checklist-90-R to measure perceived stress. R. at 351. Her overall level of distress and all contributing areas were clinically significant. Id. Ms. Green completed the Multiscore Depression Inventory, Short Form to measure depression. Id. Her overall level of depression as well as all contributing areas were clinically significant. Id. Ms. Green completed a Personality Assessment Inventory. R. at 351. Dr. Nemeth determined that Ms. Green presents with significant problems in the areas of thinking and concentration and distress and dysphoria. R. at 352. Dr. Nemeth concluded that "despite her serious mental illness, Ms. Green has the ability to become a medical assistant." R. at 353. Dr. Nemeth determined that Ms. Green would need continued 504 accommodations and tutoring in reading and that medication adjustments might be made to reduce Ms. Green's psychiatric

symptoms. Id.  Dr. Nemeth also recommended group therapy to assist Ms. Green in feeling less isolated. R. at 354.

A treatment plan dated March 14, 2016, in Ms. Green's GMHC records shows a  diagnosis of ADHD, combined presentation and other unspecified depressive disorder. R. at 310. She was assessed with a GAF of 50. Id. Her problems were noted to be attentional and anxiety. Id.  It was noted that Ms. Green had experienced fair progress in reaching the set goals and resolving the problems. R. at 316. Ms. Green reported a commitment to maintain motivation, medicine regimen, attention to health, social support, coping skills, and engagement in treatment. R. at 317. The treatment plan was for Ms. Green to see her therapist every four weeks and her physician every four months. Id.  Her personal safety plan noted triggers of excessive sensory stimulation and feeling overwhelmed. Id.

Ms. Green's March 14, 2016, individual counseling session at GMHC with licensed clinical social worker Standifer was largely devoted to constructing the treatment plan. R. at 320. Ms. Green had a flat affect, cooperative mood, and fair insight and judgment. Id. She reported poor sleep and waking feeling exhausted. Id.  She denied any further thoughts related to fellow students at local community college along the lines of wanting to "slap 'em up side the head." Id.  Ms. Green reported reduced irritability as to noise and activity level in class,  reduced difficulty managing frustration, and reduced "walking out of class." Id.   However, she also reported continued depressed mood with approximately one week of poor outlook and irritability. Id.  Ms. Green denied having friends at school. Id.

Ms. Green returned to GMHC to see licensed clinical social worker Standifer for a counseling session on April 20, 2016. R. at 411. Ms. Green displayed poor eye contact and poor, conservative speech. Id.  She had a flat affect, appeared sleepy, and was distracted by her phone

during the session. Id.  Ms. Green indicated improved insight and fair judgment. Id.  She reported that her sleep continued to be poor, but she reported reduced anxiety and irritability due to less activity in class. Id.  She denied leaving class anymore and indicated improved focus. Id.  She reported frustration with the challenge of reading comprehension and anxiety regarding answering questions in class related to reading comprehension. Id.  She reported reduced depression. Id.  She denied aggression or slamming doors at home, but she reported "yelling, cursing" at no particular person at home due to frustration. Id. Ms. Sandifer and Ms. Green planned that Ms. Green would restart calming techniques at home and school, would follow up with the optometrist, would follow up with medical staff regarding her sleep issues, and would continue compliance with medications. Id.

Ms. Green had another session with Ms. Standifer on May 26, 2016. R. at 415. Ms. Green had poor eye contact, conservative speech, and flat affect. Id.  She appeared exhausted. Id.  She indicated poor insight and judgment, but denied anger issues, suicidal or homicidal ideation, hallucinations, and panic attacks. Id.  Ms. Standifer referenced a nurse's note that Ms. Green was likely out of medication and would need to come to the walk-in-clinic for a prescription update. Id.  Ms. Green's grandmother was present and reported Ms. Green had mood swings and that nothing had changed. Id. They discussed ways to honor Ms. Green's need for time alone and privacy with the grandmother's concern for her safety. Id.  Ms. Standifer noted that the grandmother provides medication management and transportation for medical appointments for Ms. Green, but that she was not aware that Ms. Green had missed a doctor's appointment. Id.  The grandmother agreed to assist Ms. Green with follow up for medications. Id.  Ms. Standifer noted that Ms. Green became more engaged after her grandmother left. Id.  Ms. Green reported some depressed mood as her cousin/friend had not been available lately. Id.  She reported improved

coping strategies at school and that she had maintained attendance and classwork through the semester. R. at 416. Ms. Green indicated that she benefited from therapy and was motivated to continue progress in treatment goals and stability. Id.

Ms. Green presented at the GMHC walk-in clinic on July 5, 2016 and reported she had been out of medication since April. R. at 419. She reported that she was not sleeping well. Id.  She was seen by Dr. Brian Monette. R. at 421. She reported laying awake worrying and only sleeping a few hours each night. Id.  She reported having difficulty focusing and concentrating at school. Id.  She reported having trouble with grades and that this had worsened her anxiety. Id.  She admitted to being depressed and isolated in her room watching television. Id.  Upon examination, Ms. Green appeared friendly, communicative, and relaxed. Id.  Her mood was normal, associations were intact and logical, but her affect was constricted. Id.  Insight and judgment appeared developmentally appropriate. Id.  There were no signs of anxiety. Id.  Ms. Green reported wanting to get back on her medication due to her inability to sleep. Id.  Although she reported that her mood was not depressed, Dr. Monette felt that some mild depression might be present. R. at 423. Ms. Green was restarted on Lexapro, Desyrel, and Abilify. Id.

Ms. Green returned to GMHC to see Ms. Standifer for an individual counseling session on August 2, 2016. R. at 427. Ms. Green had improved eye contact and conservative but more spontaneous speech. Id.  She had a flat affect. Id.  She reported a moderate increase in awareness. Id.  She indicated some insight and moderate judgment. Id.  Ms. Green reported her sleep had improved to 8-10 hours per night. Id.  Ms. Green reported compliance with medication. Id.  She reported improved mood, focus, alertness, and appetite. Id.  She reported 3-4 times daily conflict with her grandmother about boundaries. Id.

During Ms. Green's August 30, 2016, counseling session with Ms. Standifer, they focused on constructing her treatment plan. R. at 476. Ms. Green noted her long-term goal was to be able to sleep and to reduce headaches. R. at 472. Her anxiety was identified as an active problem in need of treatment. R. at 471. The treatment plan noted a GAF of 50. R. at 471. Treatment plan goals were to reduce anxiety and address vision/headache issues. Id. Ms. Green reported poor sleep since the previous week, poor effectiveness of medication, and increased headaches. Id. She had a flat affect, poor eye contact, and conservative speech. R. at 477. She indicated some awareness and moderate insight and judgment. R. at 476. She reported some panic attacks but was unsure about their frequency. Id. She reported anxiety and feeling overwhelmed by school work. Id. She also reported longer study hours. Id. She reported that she struggles to maintain focus on her school work. Id. Ms. Standifer noted that Ms. Green was more engaged in the session and focused on treatment issues. Id.

On January 31, 2017, Ms. Green and Ms. Standifer devoted Ms. Green's counseling session to constructing Ms. Green's treatment plan. R. at 484. Ms. Green's stated goal was that her current symptoms would get better. R. at 480. Her anxiety was identified as an active problem in need of treatment. R. at 479. The treatment plan noted a GAF of 50. Id. Ms. Green had good eye contact and improved speech. R. at 484. She had a flat affect. Id. She indicated improved awareness and improved insight and judgment. Id. She reported improved sleep of six hours per night. Id. She noted her sleep was somewhat affected by headaches. Id. She reported improved mood and improved stability. Id. She reported making good grades the previous semester and having stable current grades. Id. She reported anxiety about catching on to concepts at school. Id. She reported an improved relationship with her grandmother, and she reported spending time with her cousin twice a week. Id.

Ms. Green returned to GMHC to see Ms. Standifer for a counseling session on May 2, 2017. R. at 487. Ms. Green had moderate eye contact, conservative speech, and flat affect. Id. She reported improved awareness and insight and judgment. Id. She reported overall stable sleep of six hours per night. Id. She reported daily headaches with less intensity. Id. She indicated an overall stable mood and continued focus on grades. Id. She indicated feeling satisfied and she denied anxiety. Id.

Ms. Green attended a counseling session with Ms. Standifer on June 27, 2017. R. at 492. She had overall good eye contact and less-conservative speech. Id. She was attentive, cooperative, and appeared calm. Id. She had a flat affect. Id. She again indicated improved awareness and improved insight and judgment. Id. She reported improved sleep of 9-10 hours per night. Id. She reported reduced headaches and reduced stress from being out of school for the summer. Id. She reported completing the semester well with grades. Id. She reported moderate contact with her cousin by phone and at times having telephone conversations with two classmates from school. Id. She reported continued respect from her grandmother about boundaries and her own room. Id. She expressed shock at the death of Dr. Pennington, who she said she had treated with since she was 8. Id. Ms. Green was advised that she would transfer to Dr. Serafin Gabriel's caseload. R. at 497.

Ms. Green presented at GMHC on July 5, 2017, and was seen by Dr. Gabriel. R. at 495. She reported being off medication. Id. She reported that her anxiety symptoms continued with increase in frequency or intensity while in school. Id. She reported depressive symptoms that occurred a few times per week. Id. She reported that when a depressed mood occurs, it typically lasts for days. Id. Ms. Green's self-care and domestic skills were intact. Id. She reported reduced relationships with family and friends. Id. She reported that her anger had been well controlled. Id. On examination, Ms. Green presented as glum, attentive, minimally communicative, and slow to

respond. Id.  Her mood was normal, and her affect was blunted. Id.  Her reasoning was concrete.
Id.  Her judgment and insight into problems appeared fair. Id.  There were signs of anxiety. Id.
She agreed to restart Lexapro and mirtazapine.  R. at 496. She was also prescribed trazodone and
Abilify. Id.

The state agency reviewing psychiatrist, Burnard Pearce, PhD, reviewed Ms. Green's
medical records and assessed Ms. Green's residual functional capacity on April 26, 2016. R. at
131.  Dr. Pearce opined that Ms. Green was markedly limited in her ability to understand and
remember detailed instructions, but that her ability to remember locations and work-like
procedures and her ability to understand and remember very short and simple instructions was not
significantly limited. R. at. 130. Dr. Pearce also opined that Ms. Green's ability to carry out
detailed instructions was markedly limited and that her ability to maintain attention and
concentration for extended periods was moderately limited. Id. He found Ms. Green's ability to
carry out short and very simple instructions, to perform activities within a schedule, to maintain
regular attendance, to be punctual within customary tolerance, to sustain an ordinary routine
without special supervision, to work in coordination with or in proximity to others without being
distracted by them, and to make simple work-related decisions was not significantly limited. Id.
Dr. Pearce also determined that Ms. Green's ability complete a normal workday and workweek
without interruptions from psychologically based symptoms and to perform at a consistent pace
without an unreasonable number and length of rest periods was not significantly limited. R. at 131.
Dr. Pearce opined that Ms. Green's ability to interact appropriately with the general public was
moderately limited, but that her ability to ask simple questions or request assistance, to accept
instructions and respond appropriately to criticism from supervisors, to get along with coworkers
or peers without distracting them or exhibiting behavioral extremes, and to maintain socially

appropriate behavior were not significantly limited. Id.  Dr. Pearce opined that Ms. Green can perform simple and some complex tasks, can relate to others on a superficial work basis, and can adapt to a work situation. Id.

## Decision of the Administrative Law Judge

The ALJ determined that Ms. Green has not engaged in substantial gainful activity since the application date of March 10, 2016. R. at 14. The ALJ determined that Ms. Green's impairments of intellectual disorder, affective disorder, and ADHD are severe. R. at 15. The ALJ next considered whether Ms. Green's impairments or a combination of impairments meet or equal the severity of listings 12.02, 12.04, 12.05, and 12.11 in 20 C.F.R. 404, Subpart P, Appendix 1. The ALJ determined that the "paragraph B" criteria were not satisfied, finding that Ms. Green has only a moderate limitation in the domains of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.[1] R. at 15-16. The ALJ further determined that the evidence failed to establish the presence of "paragraph C" criteria, finding that the record does not establish that Ms. Green has only a minimal capacity to adapt to changes in her environment or to demands that are not already part of her daily life. R. at 16. The ALJ also found that the criteria of "paragraph A" of Listing 12.05 was not satisfied because Ms. Green does not have significant subaverage general intellectual functioning currently manifested by an inability to participate in standardized testing of intellectual functioning and significant deficits in adaptive functioning currently manifested by dependence on others for personal needs (e.g., toileting, eating, dressing, or bathing), dating to before the attainment of age 22 . Id.

---

[1] "To satisfy the paragraph B criteria, your mental disorder must result in 'extreme' limitation of one, or 'marked' limitation of two, of the four areas of mental functioning." 20 C.F.R. § Pt. 404, Subpt. P, App. 1

The ALJ next assessed Ms. Green's residual functional capacity. The ALJ reviewed the evidence and found that Ms. Green's mental status examinations showed largely benign findings, suggesting that treatment was effective in controlling her symptoms. R. at 19. The ALJ noted that Ms. Green was able to attend school full-time and perform robust activities of daily living and that she was attentive and responsive during the hearing. R. at 18. The ALJ determined that Ms. Green has the residual functional capacity to perform a full range of work at all exertion levels but with the following nonexertional limitations: for understanding, remembering, and carrying out instructions, she is limited to mainly simple and routine tasks with the ability to perform complex tasks less than occasionally; use of judgment is limited to simple work-related decisions; occasional interaction with the general public, coworkers, and supervisors; and dealing with changes in the work setting is limited to simple work-related decisions. R. at 16. In so finding, the ALJ gave great weight to the opinion of the state agency consultant, the consultative examiner Dr. Van Hook, and examining neuropsychologist Dr. Nemeth. R. at 18.

The ALJ then determined that Ms. Green is unable to perform any past relevant work. R. at 19. The ALJ found that Ms. Green was 19 years old, which is defined as a "younger individual," on the date the application was filed. R. at 20. The ALJ found that Ms. Green has at least a high school education. Id. The ALJ determined that transferability of job skills was not an issue because the Medical-Vocational guidelines direct a finding of "not disabled" whether or not Ms. Green has transferable job skills. Id. Considering the testimony of the vocational expert and Ms. Green's age, education, work experience, and residual functional capacity, the ALJ determined that significant numbers or jobs exist in the national economy that Ms. Green can perform. Id. Thus, the ALJ concluded that Ms. Green has not been under a disability as defined in the Act since March 10, 2016, the date the application was filed. R. at 21.

**Statement of Issues on Appeal**

Issue No. 1.    Whether the ALJ failed to develop Ms. Green's residual functional capacity to reflect her ability to "sustain" work-related activities.

Issue No. 2.    Whether the ALJ's decision to reject Ms. Green's allegations concerning the severity of her symptoms is supported by substantial evidence.

Issue No. 3    Whether the ALJ ignored or dismissed the medical opinions of a social worker in violation of 20 C.F.R. §404.1527(f) concerning the use of non-medical sources.

Issue No. 4    Whether the ALJ failed to appropriately account for Ms. Green's "moderate" limitations in concentration, persistence, or pace in assessing Ms. Green's residual functional capacity.

Issue No. 5    Whether the ALJ erred in failing to factor Ms. Green's GAF scores into her residual functional capacity and the ALJ's ultimate disability determination.

Issue No. 6    Whether the ALJ erred in refusing to admit Ms. Green's "Post-Hearing Letter Brief" into the record.

**Analysis**

### I.    Standard of Review.

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence. Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005). Substantial evidence is more than "a mere scintilla," but less than a preponderance. Richardson v. Perales, 402 U.S. 389, 401 (1971); Hames v. Heckler, 707 F.2d 162, 164 (5th Cir. 1983). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (quoting Consol. Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938)). This court may not re-weigh the evidence, try the issues de novo, or substitute its judgment for the Commissioner's. Perez, 415 F.3d at 461.

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113 (1992).  Despite this Court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

## II.    Entitlement to Benefits under the Act.

To be considered disabled under the Act, a claimant must establish that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the regulations promulgated under the Act, the Commissioner engages in a five-step sequential evaluation process to determine whether an individual qualifies as disabled. See 20 C.F.R. § 404.1520(a)(4). At each step, if the Commissioner determines that an individual is or is not disabled (depending on the step), her decision is made on that basis and she does not proceed to the next step. Id. Following these same five steps, the ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart B, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his old job); and (5) whether the impairment prevents the claimant from doing any other work.

Perez, 415 F.3d at 461. The burden of proof is on the claimant in steps one through four, and then at step five, the Commissioner must "show that the claimant can perform other substantial work

in the national economy." Id. Once the Commissioner has made this showing, the claimant bears

the burden to rebut the finding. Id.  An assessment of the claimant's residual functional capacity

is used in steps four and five to determine the claimant's ability to perform his past work or any

other type of work. Id.

I.    **Plaintiff's Appeal**.

Issue No. 1.    *Whether the ALJ failed to develop Ms. Green's residual functional capacity to*
                *reflect her ability to "sustain" work-related activities.*

Ms. Green argues that the ALJ's finding that Ms. Green was limited to occasional

interaction with the general public, co-workers, and supervisors is inconsistent with a finding that

Ms. Green is able to perform work on a "sustained" basis. Ms. Green cites SSR 85-15, which

provides that in evaluating mental impairments, the analysis must proceed beyond a finding that

the impairments do not meet or equal a listed impairment to consider whether the individual can

meet the mental demands to perform her past work and, if not, whether she can perform other work

considering her "remaining mental capacities." SSR 85-15, 1985 WL 56857 (S.S.A. 1985). The

guidance goes on to explain that:

> The basic mental demands of competitive, remunerative, unskilled work include
> the abilities (on a sustained basis) to understand, carry out, and remember simple
> instructions; to respond appropriately to supervision, coworkers, and usual work
> situations; and to deal with changes in a routine work setting. A substantial loss of
> ability to meet any of these basic work-related activities would severely limit the
> potential occupational base. This, in turn, would justify a finding of disability
> because even favorable age, education, or work experience will not offset such a
> severely limited occupational base.

Ms. Green also cites SSR 96-8p, which provides that "[i]n assessing [residual functional capacity],

the adjudicator must discuss the individual's ability to perform sustained work activities in an

ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or

an equivalent work schedule)." SSR 96-8p, 1996 WL 374184 (July 2, 1996) (footnote omitted).

Ms. Green argues that in order for a person to "respond appropriately to supervision, coworkers, and usual work situations," a person would have to interact with co-workers, supervisors, and the general public more than "occasionally."

The Commissioner counters that Ms. Green has cited no legal authority to support her claim that by definition, a person limited to occasional interaction with the public, coworkers, and supervisors cannot perform work on a "sustained basis." The Commissioner points out that "[o]rdinarily, [residual functional capacity] is the individual's maximum remaining ability to do sustained work activities in an ordinary setting on a regular and continuing basis . . . ." Id. The Commissioner argues that implicit in every residual functional capacity finding is a determination that the individual can sustain those activities as stated in the residual functional capacity. See Dunbar v. Barnhart, 330 F.3d 670, 672 (5th Cir. 2003).

In the Dunbar case cited by the Commissioner, the Fifth Circuit held that:

> absent evidence that a claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC, we do not read [Watson v. Barnhart, 288 F.3d 212 (5th Cir. 2002)] to require a specific finding that the claimant can maintain employment.

Id.; see Frank v. Barnhart,  326 F.3d 618, 619 (5th Cir. 2003) ("Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment."). But it does not appear that Ms. Green argues that the ALJ should have made an explicit finding regarding Ms. Green's ability to sustain employment.

Instead, Ms. Green argues that when the ALJ limited Ms. Green to "occasional interaction with the general public, coworkers, and supervisors," the ALJ effectively found that Ms. Green could not perform work on a sustained basis. The court must reject this argument. As the

Commissioner points out, the vocational expert testified that a person with the limitations in Ms. Green's residual functional capacity, including interacting with the general public, coworkers, and supervisors only occasionally (that is, less than 1/3 of the time), could perform work as a maid, commercial cleaner, and silver wrapper. Additionally, as the Commissioner points out, the vocational expert's testimony is consistent with the Dictionary of Occupational Titles, which describes the interaction with people required for each of these jobs as "not significant." See U.S. Dep't of Labor, Dictionary of Occupational Titles, 323.686-014, 1991 WL 672783 (maid); id. 381.687-018 (cleaner); id. 318.687-018 (silver wrapper). Ms. Green has presented no evidence or legal basis to challenge the ALJ's finding that a person limited to occasional interaction with the general public, coworkers, and supervisors could not sustain employment as a maid, commercial cleaner, and silver wrapper. Accordingly, the court cannot find that the ALJ erred in finding that Ms. Green can sustain employment although she is limited to occasional interaction with the general public, coworkers, and supervisors.

*Issue No. 2.    Whether the ALJ's decision to reject Ms. Green's allegations concerning the severity of her symptoms is supported by substantial evidence.*

Ms. Green next argues that substantial evidence does not support the ALJ's determination that Ms. Green's statements concerning the limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence." Ms. Green focuses on her alleged problems with completing tasks, concentrating, and understanding and following instructions. She submits that the ALJ ignored or mischaracterized her testimony and improperly concluded that she was able to cope with college life and that she engaged in "robust activities of daily living."

The court underscores that its task on review is to determine whether the ALJ's decision is supported by substantial evidence. Perez, 415 F.3d at 461. The ALJ's failure to consider a particular piece of evidence does not necessarily justify reversal. The claimant must also show that

such failure prejudiced her. <u>Jones v. Astrue</u>, 691 F.3d 730, 734–35 (5th Cir. 2012) ("The party seeking to overturn the Commissioner's decision has the burden to show that prejudice resulted from an error."); <u>see</u> <u>Heck v. Colvin</u>, 674 F. App'x 411, 414 (5th Cir. 2017). And where a party challenges the ALJ's weighing of conflicting evidence, the court must uphold the ALJ's determination "[a]s long as there is substantial evidence in the record as a whole supporting the ALJ's determination." <u>Greenspan</u>, 38 F.3d at 240.

Here, the undersigned finds that the "mischaracterizations" Ms. Green highlights are non-prejudicial at best. She challenges the ALJ's statement that Ms. Green is in pursuit of a medical billing certification. There can be no dispute that Ms. Green is pursuing a degree or certification in medical billing and/or coding. She testified that she is attending community college to become a medical coder and her mental health records indicate that she regularly reported that she was studying for a degree or certification in medical coding and/or billing. R. at 300, 320, 411, 427, 469, 477, 484, 490, 492. Ms. Green complains that the ALJ should have taken note that when the ALJ asked what degree she was seeking, she responded that she was becoming a "medical coder." Counsel argues that Ms. Green's inability to distinguish between a college degree and the profession for which the degree was sought indicates she lacks the intellectual acumen expected of a college student. Thus, Ms. Green appears to be arguing that by stating the undisputed fact that Ms. Green is attending community college to become a medical coder, the ALJ overstated Ms. Green's mental capacity. Critically though, the ALJ's assessment of Ms. Green's residual functional capacity was not based solely on the observation that Ms. Green is attending community college to become a medical coder. Instead, as the Commissioner points out, the ALJ considered the testimony, Ms. Green's daily activities, and the opinions in the record to determine her residual functional capacity.

Ms. Green argues that the ALJ mischaracterized her testimony by stating that she attends community college full time. She insists there is no record evidence to establish this because there is no information pertaining to the hourly credits associated with the courses she was taking. The Commissioner counters by pointing out that Ms. Green indicated in her Function Report that she attended community college classes every day of the week with varying times each day. Ms. Green also testified that she attended community college classes every day. There does not appear to be a description of Ms. Green's course load as "full time" or "part time" in her testimony or elsewhere in the record. Thus, Ms. Green is correct that there is no discussion of what exactly qualifies as a "full time" course load at Ms. Green's community college and there is no analysis of whether Ms. Green's course load qualifies as "full time." But there is no indication that when the ALJ referred to Ms. Green as a "full time" community college student that he meant anything other than a student attending community college classes daily. Accordingly, the court finds that the ALJ's description of Ms. Green as a full-time student cannot fairly be described as a mischaracterization in light of her testimony and function report indicating daily attendance at classes.

Ms. Green also says the ALJ mischaracterized her testimony by reporting that she could not recall her grades. She points out that she testified that no grades were provided—not that she could not recall her grades. Her counsel concedes that Ms. Green testified that she passed her classes of algebra, human anatomy, and pathophysiology, but counsel argues that the likelihood that Ms. Green actually mastered those subjects is called into question by her full scale IQ score of 72, by her assessment as being in the borderline range of intellectual functioning, by her having "extremely low" capacity to process information reflected in her 2nd percentile rank with a process speed score of 68 on the WAIS-IV Test, and by the fact that she required special accommodations in both high school and the community college system. It does not appear that Ms. Green is actually

challenging the ALJ's observation that Ms. Green could not recall her grades as prejudicial in some way. Indeed, that observation can hardly be described as a mischaracterization in light of the fact that Ms. Green testified she had passed all her classes and her mental health records contain numerous references to her grades (having trouble with grades, making good grades, having stable grades, doing well with grades). It seems Ms. Green is more concerned that the ALJ's consideration of Ms. Green's ability to attend community college and achieve passing grades as compared to the evidence of her intellectual deficits. Importantly, though, the ALJ considered those alleged deficits in assessing Ms. Green's residual functional capacity, noting the results of cognitive function tests, her assessed reading level, the recommendation for continued 504 accommodations, and her full-scale IQ of 72. The ALJ considered this evidence as well as her daily activities (including community college attendance and performance) as reflected in both her testimony and as she reported to mental health professionals at GMHC. And critically, the ALJ considered the medical opinions of the state agency consultant, the consultative examiner, and the neuropsychologist who examined Ms. Green at the request of her counselor. Indeed, Ms. Green relies on the psychological testing performed by consultative examiner Dr. Van Hook, but Dr. Van Hook found Ms. Green's ability to understand, remember, and carry out instructions was intact during the examination and determined her ability to sustain effort and persistence at a normal pace during a 40-hour work week was only mildly impaired. R. at 335. The neuropsychologist Dr. Nemeth, who also performed testing, nonetheless determined that Ms. Green has the ability to become a medical assistant. R. at 353. The ALJ ultimately included cognitive limitations in Ms. Green's residual functional capacity by limiting her to mainly simple and routine tasks with the ability to perform complex tasks less than occasionally and to simple work-related decisions. Thus,

the court finds the ALJ's assessment of Ms. Green's residual functional capacity as to her cognitive capacity to work is supported by substantial evidence.

Ms. Green also challenges the ALJ's statement that she was able to "cope" well in a classroom setting as a mischaracterization. In this section of the ALJ's opinion, the ALJ observed that "[e]ven though the claimant does not like being around people, she has class with at least 30 people and is able to cope well in the classroom setting. She is also able to sit at shared tables with other students." R. at 18. Ms. Green submits that although she testified to attending class with 35-40 students, she made no mention of the manner in which she coped with those students. She submits that simply sitting next to other students "does not indicate the nature of the resulting interactional patterns that develop." Ms. Green argues that the ALJ does not possess the requisite medical background to draw a medical conclusion about her ability to cope with the classroom setting. She submits there are no clinical findings available to support such a finding. It is true that Ms. Green did not specifically testify about how she copes with other students in class; but it is also true that at the time of the hearing, Ms. Green had been able to attend class with 35-40 students for a year and a half. Further, the ALJ did not cite solely the hearing testimony for his conclusions regarding Ms. Green's ability to cope in the classroom setting. The ALJ also cited the records from GMHC, which indicate that after reporting difficulty in school in October 2015, by March 2016, she reported reduced irritability regarding noise and activity at school, reduced difficulty managing frustration, and reduced "walking out of class." R. at 295, 320. In April 2016 she denied leaving class any more. R. at 411. Moreover, and as noted above, the ALJ's residual functional capacity assessment was not based solely on the ALJ's assessment of the medical evidence and testimony, but on the medical opinions of the state agency consultant, the consultative examiner, and the neuropsychologist who examined Ms. Green at the request of her counselor. The court finds that

the ALJ's statement that Ms. Green was able to "cope" well in a classroom setting is not a prejudicial mischaracterization and is supported by substantial evidence.

Relatedly, Ms. Green challenges the ALJ's characterization of Ms. Green's other daily activities as "robust." She challenges the ALJ's observation that Ms. Green listened to music, visited her cousins, read magazines, watched TV during the day, bathed and dressed herself, and used public transportation. She says the ALJ ignored that Ms. Green does not interact with other college students or anyone else on the weekends. Instead, she just stays in her room. She submits that the ALJ ignored that Ms. Green testified that she no longer reads because it causes headaches. And she submits that the ALJ failed to determine that Ms. Green's "public avoidance of people suggests she is a 'loner' who prefers isolation." Counsel points out that Ms. Green testified that she only leaves her home when accompanied by someone.

As the Commissioner points out, it is appropriate for the ALJ to consider a claimant's daily activities, such as attending school, in assessing her residual functional capacity. See Leggett v. Chater, 67 F.3d 558, 565 n. 12 (5th Cir. 1995). Ms. Green fails to show how the ALJ's failure to note that she no longer reads magazines or failure to highlight that she does not spend time with other college students could be prejudicial. Had the ALJ explicitly considered these things, there is nothing to suggest that the ALJ would have come to a different determination. Ms. Green's counsel's characterization of Ms. Green as a loner who prefers isolation may be one interpretation afforded by her testimony, but it is no medical opinion. Even assuming this description of Ms. Green to be accurate, Ms. Green fails to show why this would be inconsistent with an ability to sustain employment where interactions with other people are only occasional. The court finds the ALJ's characterization of Ms. Green's daily activities is supported by substantial evidence.

The court finds no reversible error in the ALJ's interpretation of Ms. Green's testimony.

*Issue No. 3    Whether the ALJ ignored or dismissed the medical opinions of a social worker in violation of 20 C.F.R. §404.1527(f) concerning the use of non-medical sources.*

Ms. Green argues that the ALJ erred in failing to consider the opinions, statements, and general treatment notes of licensed clinical social worker Serafin Gabriel. The court notes that Gabriel[2] is a medical doctor, not a licensed clinical social worker. Ms. Green submits that Dr. Gabriel's "report" indicates increased frequency or intensity of anxiety and depressive symptoms that occurred a few times a week and lasting for days. Ms. Green argues that these opinions contradict the ALJ's conclusion regarding the robustness of Ms. Green's daily activities and relative success at community college. She also argues that Ms. Green's worsening anxiety and depression bely a conclusion "regarding the 'sustainment' of mental capacity functioning experiences." By this, Ms. Green presumably argues that Dr. Gabriel's notes are inconsistent with the ALJ's conclusion that Ms. Green could sustain continued employment.

Ms. Green's third assignment of error must be rejected. First, as the Commissioner notes, Ms. Green overstates the evidence by suggesting that Dr. Gabriel opined as to Ms. Green's anxiety and depression. Instead, the notes above were reports made by Ms. Green to Dr. Gabriel. Further, as the Commissioner points out, Dr. Gabriel's examination notes state that Ms. Green was attentive, her mood was normal with no signs of depression or mood elevation, she had concrete reasoning, her associations were intact, thought was logical, and thought content was appropriate. Ms. Green's judgment was fair. Dr. Gabriel did observe that there were signs of anxiety and noted that Ms. Green was glum, minimally communicative, and slow to respond. But, notably, Ms. Green reported being off her medication. During the visit, Ms. Green agreed to restart Lexapro and mirtazapine. She was also prescribed trazodone and Abilify.

---

[2] The medical records indicate that Ms. Green began treating with Dr. Gabriel when her previous psychiatrist, Dr. Pennington, passed way. There is only one record concerning Ms. Green's treatment with Dr. Gabriel.

The treatment notes of Dr. Gabriel cannot be construed as an opinion of a social worker that the ALJ failed to consider. Dr. Gabriel is not a social worker, he did not express an opinion regarding Ms. Green's impairments, and his treatment notes are part of the medical records from GMHC, which the ALJ considered. R. at 17. Moreover, Ms. Green can show no prejudice as a result of the ALJ's alleged failure to consider Dr. Gabriel's treatment notes. She has failed to show that Dr. Gabriel's notes, taken as a whole, are inconsistent with the ALJ's assessment of Ms. Green's residual functional capacity. The court must, therefore, reject Ms. Green's third assignment of error.

*Issue No. 4*     *Whether the ALJ failed to appropriately account for Ms. Green's "moderate" limitations in concentration, persistence, or pace in assessing Ms. Green's residual functional capacity.*

As noted above, in considering the severity of Ms. Green's impairments, the ALJ determined that Ms. Green has only a moderate limitation in the functional domains of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. Ms. Green submits that the ALJ only accounted for the first three domains in the residual functional capacity assessment but failed to include any functional limitations to address Ms. Green's moderate limitation in the domain of concentrating, persisting, or maintaining pace. Ms. Green submits that "concentration, persistence, or pace" refer to the ability to sustain focused attention and concentration long enough to permit the timely and appropriate completion of work-related tasks. Ms. Green argues that the residual functional capacity limitation to simple routine tasks fails to appropriately account for moderate limitations in concentrating, persisting, or maintaining pace. She cites cases from other circuits holding that being restricted to simple routine tasks is not the same as being able to stay on task. Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015) (quoting Winschel v. Comm'r of Soc. Sec.,

631 F.3d 1176, 1180 (11th Cir. 2011)) ("[W]e agree with other circuits that an ALJ does not account "for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work."); Ramirez v. Barnhart, 372 F.3d 546, 554 (3d Cir. 2004) (finding that a restriction to "no more than simple one or two-step tasks" did not adequately account for the claimant's frequent "deficiencies in concentration, persistence, or pace"); Newton v. Chater, 92 F.3d 688, 695 (8th Cir. 1996) (holding that a hypothetical restricting the claimant to simple jobs was insufficient to account for a claimant's deficiencies in concentration, persistence, and pace, and noting that the vocational expert had testified that a moderate deficiency in those areas would cause problems on an ongoing daily basis regardless of the skill required).  She argues that consideration of this precedent, common sense, and fundamental fairness compel a finding that the ALJ did not properly account for Ms. Green's moderate limitation in concentration, persistence, and pace.

As the Commissioner points out, the Fifth Circuit has not adopted the reasoning of the cases cited by Ms. Green. Where a claimant has moderate difficulties with concentration, persistence, and pace, the Fifth Circuit has affirmed the ALJ's decision assessing the claimant with a residual functional capacity limiting the claimant to work requiring the claimant "to understand, remember, and carry out routine step instructions and respond appropriately to supervisors and coworkers in jobs that do not require independent decision making." Herrera v. Comm'r of Soc. Sec., 406 F. App'x 899, 902–04 (5th Cir. 2010) (unpublished); see Bordelon v. Astrue, 281 F. App'x 418, 422–23 (5th Cir. 2008) (holding that a restriction to work involving one to two step instructions, low stress, and with limited public interaction "reasonably incorporated [the claimant's] moderate concentration, persistence, and pace limitations."). District courts have also found that "an RFC limited to simple work reasonably incorporates a moderate or even *marked*

limitation in concentration, persistence, or pace." Ricks v. Colvin, No. CIV.A. 12-2647, 2014 WL 333911, at *8 (W.D. La. Jan. 29, 2014); see Davis v. Astrue, No. CIV.A. 13-00065-BAJ, 2014 WL 4386367, at *4–5 (M.D. La. Sept. 4, 2014) (finding substantial evidence supported the ALJ's residual functional capacity assessment limiting the claimant to non-complex work where the claimant had moderately limited ability to maintain concentration, persistence, and pace); Reid v. Astrue, No. 3:10CV237 WHB-LRA, 2011 WL 4101302, at *9 (S.D. Miss. Aug. 15, 2011), report and recommendation adopted, No. 3:10-CV-237-WHB-LRA, 2011 WL 4101277 (S.D. Miss. Sept. 8, 2011) (holding that the ALJ's "finding that Plaintiff's residual functional capacity was limited to simple instructions . . . was a reasonable incorporation of her moderate limitations in concentration, persistence, and pace.").

The Commissioner argues that the ALJ's residual functional capacity determination adequately accounts for Ms. Green's moderate limitations in concentration, persistence, or pace. In light of the case law out of this circuit, this court agrees. Courts have repeatedly held that moderate limitations in concentration, persistence, and pace are accommodated by limitations like those imposed by the ALJ here: that Ms. Green is limited to work involving mainly simple to routine tasks with complex tasks less than occasionally; simple work-related decisions; occasional interaction with the general public, coworkers, and supervisors; and no shift work or route sales work. Ms. Green does not point to any evidence of functional limitations that are not accommodated by the ALJ's residual functional capacity. Dr. Van Hook, the consultative examiner, opined that Ms. Green's ability to maintain attention/concentration for performance of simple repetitive tasks was reasonable. R. at 335. The results of the assessments conducted by Dr. Nemeth were more complex. She observed that Ms. Green exhibited difficulties with inattention after the first five minutes of on-task behavior and presented with significant problems in the areas

of thinking and concentration, but ultimately concluded that "despite her serious mental illness, Ms. Green has the ability to become a medical assistant." R. at 353. Of note, Ms. Green was not on attentional medication at the time of Dr. Nemeth's examination. R. at 343. Ms. Green's testimony before the ALJ did not concern problems with concentration, attention, persistence, or pace, other than her statement that she cannot clean her room at a fast pace. R. at 47. Considering the law in this circuit and the facts of Ms. Green's case, the court finds that the ALJ properly accounted for Ms. Green's moderate limitations in concentration, persistence, and pace.

*Issue No. 5      Whether the ALJ erred in failing to factor Ms. Green's GAF scores into her residual functional capacity and the ALJ's ultimate disability determination.*

Ms. Green argues that the ALJ erred by failing to give any weight to the GAF assessments by Ms. Green's treating social worker. She points out that Ms. Green's treating social worker assessed Ms. Green's GAF score at 50 in September 2015, March 2016, August 2016, and January 2017. She insists that because these scores were provided over time, they should not be viewed as merely a "snap shot," as suggested by the ALJ. She argues that the GAF scores should be viewed as evidence from "other sources" that should be evaluated using the factors set forth in 20 C.F.R. §416.927d. See SSR 06-0p,  2006 WL 2329939 (Aug. 9, 2006). She submits that generally the ALJ should explain the weight given to opinions from "other sources." Id.  Ms. Green complains that the ALJ improperly excluded Ms. Green's GAF scores in the development of her residual functional capacity. She insists that the GAF scores would have provided crucial supportive evidence for a finding of disability.

The Commissioner argues that the Social Security Administration has recognized that GAF scores do not necessarily relate to whether a claimant is disabled under the act and that GAF scores do "not have a direct correlation to the severity requirements in our mental disorders listings."

Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed. Reg. 50746, 50764-65. The Commissioner submits that GAF scores are merely a snapshot in time, as the ALJ stated in his opinion. The Commissioner further argues that when GAF scores conflict with other evidence in the record, it is within the ALJ's province to resolve such conflicts. For example, the Commissioner points out, the record shows that Ms. Green was able to attend classes and examination notes indicate she had logical thinking, appropriate thought content, fair insight, fair judgment, and cooperative behavior with "no gross abnormalities."

The court first notes that the ALJ did not ignore Ms. Green's GAF scores. The ALJ devoted a paragraph of his opinion to explaining why the GAF scores were given little weight, noting that the Commissioner has declined to endorse GAF scores. See Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, supra. The ALJ decided to give little weight to Ms. Green's GAF scores "because they are only a snapshot and not probative of the claimant's overall mental health status." R. at 19.

The GAF scale involves consideration of psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994). A GAF score in the range of 41-50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Id.   While a GAF score can be a factor considered in assessing a claimant's functional limitations, courts have held that "a GAF score is not determinative of a claimant's ability to work." Andrews v. Astrue, 917 F. Supp. 2d 624, 638 (N.D. Tex. 2013). Indeed, although the case cited by the Commissioner does not involve GAF scores, the Commissioner correctly points out that "[c]onflicts in the evidence, *including those arising in medical*

34

*opinions,* are to be resolved not by the courts, but by the Secretary." Jones v. Heckler, 702 F.2d 616, 621 (5th Cir. 1983) (quoting Laffoon v. Califano, 558 F.2d 253, 254 (5th Cir. 1977)) (alterations in original).

In assessing Ms. Green's residual functional capacity, the ALJ gave great weight to the opinions of the state agency reviewing consultant, the consultative examiner Dr. Van Hook, and examining neuropsychologist Dr. Nemeth. The state agency reviewing psychiatrist Dr. Pearce considered the medical records and opined that Ms. Green's ability to maintain attention and concentration for an extended period was only moderately limited. R. at 130. Dr. Pearce opined that although Ms. Green's ability to carry out detailed instructions was markedly limited, her ability to to carry out short and very simple instructions, to perform activities within a schedule, to maintain regular attendance, to be punctual within customary tolerance, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, and to make simple work-related decisions was not significantly limited. Id. Dr. Pearce opined that Ms. Green's ability to interact appropriately with the general public was moderately limited, but that her ability to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and to maintain socially appropriate behavior were not significantly limited. Id.

The consultative psychiatrist Dr. Van Hook found Ms. Green's ability to maintain attention/concentration for performance of simple repetitive tasks was reasonable and that she showed an adequate level of social judgment and understanding of the general principles related to social situations. R. at 335. Dr. Van Hook found Ms. Green's ability to sustain effort and persist at a normal pace over the course of a routine 40-hour workweek was only mildly impaired. Id.

And Dr. Nemeth's report, although it recited problems with Ms. Green's adaptive skills and in the areas of thinking and concentration, concluded that Ms. Green has the ability to become a medical assistant. R. at 351-53.

Further, the court notes that here, the GAF scores of 50 appear to conflict with the treatment notes of the social worker on the same day on at least three of the four assessments. When the first GAF score of 50 was assessed on September 22, 2015, Ms. Green was in a good mood, had a bright affect, her self-care skills were intact, her relationships with family and friends were normal, and her school performance were normal. R. at 278, 281. There were no signs of anxiety and Ms. Green's mental status had no gross abnormalities. R. at 278-79. On March 14, 2016, her GMHC records again reflect a GAF score of 50, yet it was noted that Ms. Green reported reduced irritability as to noise and activity level in class,  reduced difficulty managing frustration, and reduced "walking out of class." R. at 310, 320. Ms. Green's January 31, 2017, treatment plan noted a GAF of 50, but the social worker also noted that Ms. Green indicated improved mood and stability and reported making good grades the previous semester and having stable current grades. R. at 479, 484.

As the Commissioner points out, throughout the medical records, the treatment notes indicate Ms. Green had logical thinking, appropriate thought content, fair insight, fair judgment, and cooperative behavior with "no gross abnormalities." Ms. Green is able to attend community college courses with 35-40 students five days a week.

The ALJ was not required to give determinative weight to the GAF scores. The ALJ considered all of the evidence in assessing Ms. Green's residual functional capacity, and the ALJ incorporated limitations to address Ms. Green's mental health impairments. The ALJ's decision to

give little weight to the GAF scores in light of Ms. Green's overall mental health status is supported by substantial evidence.

Issue No. 6     *Whether the ALJ erred in refusing to admit Ms. Green's "Post-Hearing Letter Brief" into the record.*

Ms. Green argues that the ALJ erred in refusing to admit Ms. Green's post-hearing brief into the record. Ms. Green acknowledges that the regulations require that if written evidence is submitted less than five days before the hearing, the ALJ may refuse to admit such evidence absent good cause. 20 C.F.R. §416.1435. Good cause exists if:

> (1) [The SSA's] action misled [the claimant];
> (2) [The claimant] had a physical, mental, educational, or linguistic limitation(s) that prevented [her] from informing [the SSA] about or submitting the evidence earlier; or
> (3) Some other unusual, unexpected, or unavoidable circumstance beyond [the claimant's] control prevented you from informing us about or submitting the evidence earlier. Examples include, but are not limited to:
>> (i) [The claimant was] seriously ill, and [her] illness prevented [her] from contacting [the SSA] in person, in writing, or through a friend, relative, or other person;
>> (ii) There was a death or serious illness in [the claimant's] immediate family;
>> (iii) Important records were destroyed or damaged by fire or other accidental cause; or
>> (iv) [The claimant] actively and diligently sought evidence from a source and the evidence was not received or was received less than 5 business days prior to the hearing.

Id.  § 416.1435(b). Ms. Green does not argue that she had good cause for submitting a brief after the hearing. She argues that her brief is an "expression" and not evidence. Because the brief is not evidence, she argues it is not covered by the rule. She insists her post-hearing brief is based on facts that may have come into the record via testimony and that, therefore, it would be impossible to submit five days in advance of the hearing.

The Commissioner points out that the ALJ considered the regulation cited above and determined that the requirements of §416.1435(b) had not been met. The Commissioner adds that Ms. Green does not contend that she has met these requirements. Further, the Commissioner argues that Ms. Green fails to demonstrate why her "expressions" could not have been presented by her counsel during the hearing.

The court finds no basis to hold that Ms. Green's brief is not subject to the regulations regarding submission of evidence. There is, apparently, no other rule governing the admission of legal briefs into evidence. Ms. Green's interpretation would require that a letter brief could be submitted at any time—even the day of the ALJ's decision—and be made part of the record. This proposal is illogical. Ms. Green could have submitted her legal brief before the hearing based on the medical records and her expected testimony. As the Commissioner notes, she could have raised her legal arguments in closing at the hearing.   Further,  Ms. Green has not cited any prejudice that she has suffered as a result of the failure to admit her legal brief, which she admits contains no evidence in support of her claim. The court finds this assignment of error without merit.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that the Motion for Summary Judgment filed by the plaintiff (Rec. Doc. 13) be DENIED; and the Motion for Summary Judgment filed by the Commissioner (Rec. Doc. 18) be GRANTED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by

the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 18th day of December, 2019.


_____
Janis van Meerveld
United States Magistrate Judge